IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 4:89cr4006-WS-CAS

STANTON ROBINSON

*Defendant.*
_____/

UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR A SENTENCE REDUCTION

The United States of America, by and through the undersigned Assistant

United States Attorney, hereby responds in accordance with this Court's Order

entered on May 13, 2019. Doc. 845. Defendant Stanton Robinson

("Defendant") has moved, through counsel, for a sentence reduction under the

First Step Act of 2018. Docs. 844. For the reasons explained in this response,

the government opposes any reduction of Defendant's life sentence.

I.  Background

In April of 1989, a grand jury charged Defendant with conspiracy to

possess with intent to distribute 50 grams or more of cocaine base[1] and

possession with intent to distribute 50 grams or more of a substance containing

_____

[1] Ten coconspirators, including Defendant's twin brother, were also charged with conspiracy.
PSR ¶ 1.

cocaine base. PSR ¶ 1. The government subsequently filed an information establishing two or more prior felony drug convictions. PSR ¶ 28. If convicted, this meant Defendant was subject to a statutory minimum of life imprisonment under 21 U.S.C. § 841(b)(1)(A)(iii). A jury convicted Defendant of both counts. PSR ¶ 1.

According to the presentence report, Defendant and his co-conspirators were "crack cocaine traffickers who operated between Fort Lauderdale and Tallahassee, Florida between June of 1987 and April of 1988." PSR ¶ 4. Defendant and his identical twin brother led the trafficking operation, which began in Fort Lauderdale but moved to Tallahassee to take advantage of "the lesser competition and untapped markets." PSR ¶ 5. The group was responsible for bringing approximately 100 kilograms of crack cocaine for distribution in the Tallahassee area, with Defendant "directly involved with well over 10 kilograms" of crack. PSR ¶¶ 4, 6. After the arrest of Defendant's brother for the attempted murder of another drug dealer, as well as the arrests of three other coconspirators, Defendant tried to continue the operation on a smaller scale. PSR ¶ 5. However, increased police attention, the inability to collect on drug debts, and a firearm injury prompted Defendant to relocate to Wichita, Kansas, where he continued distributing crack cocaine until his arrest in this case. PSR ¶ 5.

Defendant "routinely carried firearms during his drug activities," and was twice arrested with a firearm in his possession. PSR ¶ 8. During the second arrest—his arrest in Wichita—he taunted that "the cops should be careful because he always kept a round in the chamber." *Id.* He also employed "force and violence" during his trafficking. PSR ¶ 9. For instance, he beat his girlfriend and threatened her with "greater injury" if she left him. *Id.* When faced with prosecution in this case, he sought to intimidate her. PSR ¶ 10. He also boasted involvement in two murders: (1) one where he claimed he and his brother had murdered a man who was robbing their father's drug business (a statement corroborated by their father's guilty plea to that murder and his statements indicating that his two sons were also involved), and (2) one where he killed another man in 1987 for robbing him. PSR ¶ 9. In addition to these murders, Defendant's girlfriend claimed knowledge of another incident where Defendant "put a pistol to the head of a dealer who didn't pay." *Id.*

When Defendant was eventually arrested in Wichita, he employed his usual, obstructive tactic of lying to police about his identity. PSR ¶ 10. Indeed, Defendant "habitually used false names when arrested in an attempt to escape responsibility for his crimes and to frustrate his prosecution." *Id.*

Because the offense involved "over 500 grams of cocaine base," Defendant's presentence report began with a base offense level of 36 under

3

§2D1.1(a)(3). PSR ¶ 14. He received a two-level increase for his use of a firearm during the offense, a four-level increase for his role as a leader of the conspiracy, and a two-level increase for his obstruction of justice. PSR ¶¶ 15-18. This resulted in a total offense level of 44. PSR ¶¶ 19-20. With 8 criminal history points, the presentence report placed Defendant in criminal history category IV. PSR ¶¶ 25-26. A total offense level of 36 and a criminal history category of IV resulted in a guideline range of life imprisonment. PSR ¶ 29.

In January of 1990, this Court sentenced Defendant to life imprisonment, the statutorily required sentence. *See* Docs. 395, 396. The Eleventh Circuit affirmed and the Supreme Court denied certiorari. *See* Docs. 532, 533.

Over 18 years later, in April of 2008, Defendant moved for a sentence reduction under Amendment 705 of the Sentencing Guidelines. Doc. 790. This Court denied Defendant's motion, concluding that it lacked jurisdiction to reduce Defendant's sentence because of the statutory minimum. Doc. 813. Defendant subsequently applied for but was denied a sentence commutation by President Obama. *See* Commutations Denied by President Barack Obama *available at* https://www.justice.gov/pardon/obama-denials/commutations-denied-president-barack-obama#April2016 (commutation denied Aug. 8, 2016).

In December of 2018, Congress passed the First Step Act, which made the

Fair Sentencing Act of 2010 retroactively applicable to certain defendants sentenced for crack cocaine offenses before its enactment. This Court appointed Defendant counsel, Doc. 841, and Defendant filed a counseled motion for a reduction in his life sentence under the First Step Act. Doc. 844. For the reasons explained below, the government respectfully opposes any reduction in Defendant's sentence.

## II. Finality & The First Step Act

"Federal courts are forbidden, as a general matter, to modify a term of imprisonment once it has been imposed, but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 131 S. Ct. 3685, 2690 (2001) (internal citation and quotations omitted). Section 3582(c) creates three statutory exceptions to the general rule of finality. 18 U.S.C. § 3582(c); *United States v. Phillips*, 597 F.3d 1190, 1194-95 (11th Cir. 2010). The exception relevant here, found in § 3582(c)(1)(B), provides that a court "may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute. 18 U.S.C. § 3582(c)(1)(B). *See also United States v. Glover*, 2019 WL 1924706 at *9-10 (S.D. Fla. May 1, 2019) (observing that First Step Act reductions are authorized under § 3582(c)(1)(B)). Absent an exception to the rule of finality, the court lacks jurisdiction to modify a sentence. *United States v. Diaz-Clark*, 292 F.3d 1310, 1315-19 (11th Cir. 2002).

Section 404 of the First Step Act grants the Court the authority "to impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 … were in effect at the time [a] covered offense was committed." First Step Act of 2018, Pub. L. No. 115-391, § 404(b). But this relief is only available to defendants sentenced for "covered offenses," which the Act defines as "violation[s] of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010[.]" First Step Act, § 404(a). Section 2 of the Fair Sentencing Act increased the threshold quantities of crack cocaine required to trigger different statutory penalties for violations of § 841(a) under § 841(b)(1), from 5 grams to 28 grams for penalties under § 841(b)(1)(B)(iii) and from 50 grams to 280 grams for penalties under § 841(b)(1)(A)(iii). Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2. Thus, a defendant has been sentenced for a "covered offense" and is eligible for a sentence reduction only where the statutory penalties for his violation have been lowered by the Fair Sentencing Act.

III.   Because the Statutory Penalties have Not Changed, Defendant is Not Eligible for a Reduction Under the First Step Act

Before the Court can determine whether the Fair Sentencing Act has modified the penalty for a violation of federal law, it must first determine what that penalty is. The violations in this case, and the offenses for which Defendant was sentenced, were conspiracy to possess with intent to distribute and

possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a) & 846. A § 841(a) offense occurs "without regard to the nature and quantity of the controlled substance." *United States v. Cross*, 916 F.2d 622, 623 (11th Cir. 1990). *See also United States v. Sanchez*, 269 F.3d 1250, 1267 (11th Cir. 2001) (en banc) ("Congress decided that the elements of a § 841 offense do not include the weight of the drugs."), *abrogated in part*, *United States v. Duncan*, 400 F.3d 1297, 1308 (11th Cir. 2005).  The penalties for a § 841(a) offense are dictated by § 841(b), which sets forth a "host of sentencing factors, including drug types and quantities" that dictate the applicable sentencing range. *Id.* at 1264-65. The factors listed in § 841(b) are not elements of an § 841(a) offense and are "relevant only to determining a defendant's sentence for having violated § 841(a)." *Id.* at 1266 & n.4.  The plain language of § 841(b) makes clear that the penalty is determined based upon the quantity of the controlled substance involved in the violation.

When he was sentenced in 1990, Defendant's § 841(a) violations fell under § 841(b)(1)(A)(iii), which, due to his two prior felony drug convictions, mandated a life sentence for an offense involving at least 50 grams of crack cocaine. As stated previously, the Fair Sentencing Act only modified the penalties associated for crack cocaine offenses such that enhanced penalties under § 841(b)(1)(A)(iii) are now trigged by crack cocaine offenses involving at

least 280 grams. *See* 21 U.S.C. § 841(b)(1)(A)(iii). This Court determined at sentencing—and Defendant does not dispute—that his violations of § 841(a) involved at least 10 kilograms of crack cocaine. PSR ¶ 6. A violation involving at least 10 kilograms of crack cocaine still triggers penalties under § 841(b)(1)(A)(iii) even after the Fair Sentencing Act. Thus, the statutory penalties for Defendant's offense have not changed, and he is not eligible for a sentence reduction under the First Step Act.

Defendant acknowledges he was held accountable for at least 10 kilograms of cocaine at his sentencing but argues is he eligible for a reduction because the indictment only charged him with offenses involving 50 grams or more of crack cocaine. Whether eligibility for a First Step Act reduction depends on the amount charged in the indictment as opposed to the amount actually involved in a defendant's violation is an issue that has divided districts across the country, including this district. To be sure, this Court has twice held the amount charged in indictment controls whether a defendant is eligible for a sentence reduction. *See United States v. James*, No.90cr4051-WS/GRJ (Doc. 823); *United States v. Emerson Davis*, No. 4:92cr4013-WS/CAS (Doc. 2245). The government respectfully disagrees with that interpretation of the First Step Act and seeks to preserve the issue for further appellate review.

In defining "covered offense," Congress did not use the word "charge" or

"conviction." Rather, mirroring the language of § 841(b), the Act refers to "violations" of § 841(a). First Step Act, § 404(a). By referring to a "violation" that was "committed" on a particular date, § 404(a) sensibly grounds the eligibility inquiry in the actual conduct involved in the defendant's violation, rather than the statute under which the defendant was convicted. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 489 (1985), for instance, the Supreme Court held in the context of 18 U.S.C. § 1964(c) that the term "violation" "refers only to a failure to adhere to legal requirements," not a criminal conviction. The Court explained that when Congress wishes to refer to "prior convictions, rather than prior criminal activity," it uses the term "conviction," not "violation." *Id.* at 489 n.7. And in *United States v. Hayes*, 555 U.S. 415 (2009), the Court held that a statute defining a prior conviction for a "misdemeanor crime of domestic violence" referred in part to the defendant's actual conduct, not the statutory elements of the crime, when it described the prior offense as one "*committed by* a current or former spouse, parent, or guardian." *Id.* at 426 (emphasis added) (quoting 18 U.S.C. § 921(a)(33)(A)); *cf. Nijhawan v. Holder*, 557 U.S. 29, 32 (2009) (holding that a statutory term describing a prior "offense" referred not to a generic crime but to the "particular circumstances in which an offender committed" that offense "on a particular occasion").

In *James*, this Court reasoned that the term "covered offense" could not

refer to a defendant's conduct because the "offense" of conviction is defined in the indictment. Defendant echoes this argument. Doc. 844 at 10-11. But these arguments rely on the common understanding of what an "offense" is and ignore the definition of "covered offense" provided in the First Step Act. In defining "covered offense" as a "*violation* of a Federal criminal statute, the statutory penalties for which were modified" by the Fair Sentencing Act, First Step Act § 404(a) (emphasis added), Congress expressly declined to determine eligibility based on the offense charged in the indictment. "The word 'which' in this definition of 'covered offense' modifies 'violation of a criminal statute.'" *Blocker*, 2019 WL 2051957 at *3. And "[t]he 'violation' of the criminal statute is the criminal conduct; the violation is not in the indictment." *Id.*  Had Congress intended this Court to be bound by what the Defendant was charged with or necessarily convicted of, it would have said so, as it has it other statutes. *See Descamps v. United States*, 570 U.S. 254, 267-68 (2013) (observing that the ACCA's reference to "previous convictions" shows that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions.").

Reading the word "violation" in the First Step Act as referring to the defendant's actual conduct, as determined by the court, is also consistent with

the way courts have unanimously interpreted § 841(b), which also refers to "violations" of § 841(a). These courts, including the Eleventh Circuit, have interpreted the plain language of § 841(b) as "setting forth purely sentencing factors" to be found by the court looking to the facts of a defendant's § 841(a) offense. *See Sanchez*, 269 F.3d at 1266-68 & n.30. Of course, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, the enhanced penalties enumerated in § 841(b) can no longer apply to a defendant "unless the jury determines the drug type and quantity involved in the overall drug conspiracy." *United States v. Sanders*, 668 F.3d 1298, 1309-10 (11th Cir. 2012). But *Apprendi* "did not announce any new principles of statutory construction," and thus "did not change [the Eleventh Circuit's] precedent interpreting § 841." *Sanchez*, 269 F.3d at 1268 ("While *Apprendi* does not affect our prior statutory construction of § 841(b) as setting forth purely sentencing factors, it does alter our prior conclusion that such judge-decided facts satisfy a defendant's constitutional rights[.]"). Thus, as a constitutional matter, the "sentencing factors" enumerated in § 841(b) are elements that must be found by a jury beyond a reasonable doubt. But, as a matter of statutory interpretation, Congress intended them to reside within the purview of the sentencing court. *See id.* So too with the First Step Act.

Significantly, the constitutional concerns underlying *Apprendi* and its progeny are not present in First Step Act cases. Because the First Step Act

operates in conjunction with § 3582(c)(1)(B) as one of the narrow exceptions to the general rule of finality, *see Phillips*, 597 F.3d at 1194-95, the proceedings are limited in scope. *See United States v. Bravo*, 203 F.3d 778, 781-82 (11th Cir. 2000) (observing that the court's discretion has "clearly been cabined in the context of a [§] 3582(c) sentencing reconsideration."). "Notably," the Supreme Court has observed in similar contexts, sentence reduction proceedings "are not constitutionally compelled." *Dillon v. United States*, 560 U.S. 817, 828 (2010). And contrary to Defendant's assertions, Doc. 844 at 7-8, the Supreme Court made it clear in *Dillon* that reduction proceedings "do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt" because the facts found by a judge during such proceedings "do not serve to *increase* the prescribed range of punishment[.]" *Dillon*, 560 U.S. at 828 (emphasis added). Rather, these reductions are "a congressional act of lenity." *Id.*[2]

Given the holding in *Dillon*, every appellate court to address the issue has held that a court may make factual findings based on the record to determine whether the offense involved a quantity that makes a defendant ineligible a

---

[2] As Defendant notes (and as the government has admittedly argued in other First Step Act cases), *Apprendi* and its progeny are not retroactively applicable. *See Jeanty v. Warden, FCI Miami*, 757 F.3d 1283, 1285-86 (11th Cir. 2014). But that should make little difference because the concerns underlying *Apprendi* and related cases are simply not implicated in proceedings where a court considers whether to *reduce* a sentence. *See Dillon*, 560 U.S. at 828.

sentence reduction under § 3582(c)(2) based on a retroactive amendment to the drug guideline. *See, e.g.*, *See United States v. Hamilton*, 715 F.3d 328, 340 (11th Cir. 2013); *United States v. Rios*, 765 F.3d 133, 138 (2d Cir. 2014); *United States v. Peters*, 843 F.3d 572, 578 (4th Cir. 2016); *United States v. Valentine*, 694 F.3d 665, 670 (6th Cir. 2012); *United States v. Hall*, 600 F.3d 872, 876 (7th Cir. 2010); *United States v. Anderson*, 707 F.3d 973, 975 (8th Cir. 2013); *United States v. Mercado-Moreno*, 869 F.3d 942, 953–55 (9th Cir. 2017); *United States v. Battle*, 706 F.3d 1313, 1319 (10th Cir. 2013); *United States v. Wyche,* 741 F.3d 1284, 1293 (D.C. Cir. 2014). In reasoning that is directly applicable to the present situation as well, the Ninth Circuit explained:

> Typically, in those cases, neither the court nor the parties anticipate a future Guidelines amendment that will move the line and require further fact-finding to determine the defendant's eligibility for a sentence reduction under § 3582(c)(2).
>
> In those cases where a sentencing court's quantity finding is ambiguous or incomplete, a district court may need to identify the quantity attributable to the defendant with more precision to compare it against the revised drug quantity threshold under the relevant Guidelines amendment. The Supreme Court indicated that such fact-finding was permissible in *Dillon*. *See* 560 U.S. at 828-29 (stating that "facts found by a judge at a § 3582(c)(2) proceeding do not serve to increase the prescribed range of punishment").

*Mercado-Moreno*, 869 F.3d at 954. The same fact-finding is necessary here to compare the drug quantity attributable to Defendant against the revised drug quantity thresholds under the Fair Sentencing Act, and it is not restricted by

*Apprendi* and *Alleyne*[3]. In this case, however, the fact-finding is easy: It is undisputed that the defendant's offense involved at least 10 kilograms of crack.

There are also strong policy reasons against interpreting the First Step Act as Defendant asks. The purpose of the Fair Sentencing Act was to adjust the crack-to-powder ratio used to trigger § 841(b)'s penalties. *Dorsey v. United States,* 567 U.S. 260, 268-269 (2012). This change was prompted by a serious of Sentencing Commission reports

> telling Congress that the ratio was too high and unjustified because, for example, research showed the relative harm between crack and powder cocaine less severe than 100-to-1, because sentences embodying that ratio could not achieve the Sentencing Reform Act's "uniformity" goal of treating like offenders alike, because they could not achieve the "proportionality" goal of treating different offenders (e.g. major drug traffickers and low-level dealers) differently and because the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences.

*Id.* at 268 (quoting *Kimbrough v. United States,* 552 U.S. 85, 97-98 (2007)). In lowering the ratio (thus raising the threshold for crack cocaine offenses) Congress signaled a desire to make the sentences for low-level dealers of crack and powder more proportional. It did nothing to alter, nor was it designed to alter, the sentences for offenders trafficking in more significant quantities of drugs, such as Defendant.

---

[3] *Alleyne v. United States*, 570 U.S. 99 (2013).

Defendant's interpretation also results in a windfall for defendants who distributed substantial quantities of drugs just because they happened to be sentenced before the Fair Sentencing Act. As a practical matter, before the Fair Sentencing Act, no indictment seeking penalties under § 841(b)(1)(A)(iii) would allege that the offense involved 280 grams or more of crack cocaine. That means, under Defendant's interpretation, every Defendant sentenced under § 841(b)(1)(A)(iii) for a crack offense before the Fair Sentencing Act is eligible for a reduction under the First Step Act, regardless of whether substantial amounts of drugs were involved in their offenses or whether the Fair Sentencing Act was intended to apply to them.[4] Such an interpretation invites the exact kind of egregious sentencing disparities the Fair Sentencing Act sought to avoid.

Consider, for example, a defendant with two prior drug felonies sentenced in 2011, after the Fair Sentencing Act, for distributing exactly 280 grams of crack cocaine, as alleged in the indictment. That defendant would have received a mandatory life sentence under § 841(b)(1)(A)(iii). Or another defendant, also with two prior drug felonies, sentenced before the Fair Sentencing Act for conspiring to distribute 5 kilograms of powder cocaine. He too would have

---

[4] The same is true for defendants sentenced under § 841(b)(1)(B) before the Fair Sentencing Act, since indictments seeking such penalties would not have alleged 28 or more grams of crack. In sum, under Defendant's interpretation, every defendant sentenced to enhanced penalties before the Fair Sentencing would be eligible for a reduction based upon lesser penalties, with no regard for the actual quantity of drugs involved in their offense or the sentences received by similarly situated defendants after the Fair Sentencing Act.

received a mandatory life sentence. Then consider Defendant, who also has at least two prior drug felonies and was convicted of a cocaine conspiracy involving 100 kilograms of crack cocaine, at least 10 of which he was "directly" involved with. If Defendant was prosecuted after the Fair Sentencing Act, there can be no dispute that the indictment would have alleged 280 grams of crack cocaine and Defendant still would have received a mandatory life sentence under § 841(b)(1)(A)(iii). But, in Defendant's view, because he was prosecuted before the Fair Sentencing Act, when § 841(b)(1)(A)(iii)'s threshold was only 50 grams, he escapes a life sentence by the fortuitous fact that the government, lacking clairvoyance and tracking the statute as it existed at the time, did not allege 280 grams of crack in his indictment. Yet the other defendants (whose offenses involved smaller quantities of drugs) remain imprisoned for life. That kind of discrepancy cannot be what Congress intended in making the Fair Sentencing Act retroactively applicable.[5]

In *James*, this Court rejected the government's argument that the "indictment-controls" interpretation of the First Step Act gives way to the

---

[5] Defendant recognizes that his interpretation leads to sentencing disparities but dismisses their relevance. Doc. 844 at 14. There can be no dispute that Congress intended the Fair Sentencing Act, made retroactively applicable by the First Step Act, to reduce sentencing disparities, not create them. When an interpretation of a statutory provision is contrary to Congress' manifest intent, that interpretation should be rejected. *Solis-Ramirez v. U.S. Dept. of Justice*, 758 F.2d 1426, 1431 (11th Cir. 1985) ("The court's first duty in construing a statute is to give effect to the intent of Congress").

sentencing disparities described above because a court, in its discretion, may still decline to reduce an eligible defendant's sentence. But whether courts ultimately exercise their discretion that way says nothing about whether Congress intended those defendants to be eligible for a reduction in the first instance. Indeed, by legislating these statutory minimums and maximums for offenses involving at least 280 grams of crack, Congress expressly intended to limit the court's discretion, not defer to it.[6]

The better view—and the only one that avoids the kind of incongruous results described above—is that Congress intended courts to determine a defendant's eligibility for a reduction under the First Step Act by looking to the quantity of drugs actually involved in the defendant's violation of § 841(a), as determined by the court. Such findings were either acquiesced to by the defendant or made by the sentencing court based upon "substantial evidence" with the benefit adversarial testing by the defendant. *United States v. Ellisor*, 522 F.3d 1255, 1273 n.25 (11th Cir. 2008) ("At a minimum, there must be substantial evidence to support a factual finding," and such findings may be based on,

---

[6] It is also unclear that courts are exercising their discretion this way. For example, in *United States v. Boulding*, ___ F.Supp.3d ___, 2019 WL 2135494 (W.D. Mich. May 16, 2019)—a case relied upon by this Court in *James*—Judge Jonker reduced the defendant's life sentence to a term of 324 months, even though it was undisputed his offenses involved over 650 grams of crack cocaine and that, with two felony drug convictions, he would have received a life sentence even after the Fair Sentencing Act. Any reduction in this case would create the same kind of disparity.

"among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing."). This Court therefore can and should determine whether the defendant's violation involved quantities that would have triggered the same penalties had the Fair Sentencing Act been in effect. Here, it is evident that the same sentencing range would have applied, and that means Defendant is not eligible for relief.

While the district courts have not uniformly adopted the government's approach (or any other approach, for that matter), several courts have persuasively approved the position set forth here. Judge Hinkle, for example, in a lengthy opinion in *United States v. Blocker*, ___ F.Supp.3d _____, 2019 WL 2051957 (N.D. Fla. Apr. 25, 2019), observed that the defense position "would not eliminate disparity but instead would introduce enormous disparity in the opposite direction, giving earlier crack defendants a lower penalty range not available to later crack defendants." *Id.* at *5. The court identified another absurdity in the defense position:

> Similarly, the Fair Sentencing Act was intended to lower the sentencing disparity between crack and powder, changing the 100-to-1 drug-amount ratio to approximately 18-to-1. The First Step Act was intended to give that same benefit to earlier crack defendants. The offense-controls theory [determining eligibility based on actual conduct] accomplishes that result. But if sentences for crack offenses are now lowered based on the indictment-controls theory [looking only to the charge in the indictment], an enormous disparity will be created in the opposite direction. Many defendants who committed crack offenses prior to adoption of the Fair Sentencing Act will be

subject to lower penalty ranges than defendants who committed offenses involving the same amount of powder.

Consider, for example, two defendants, one who conspired in 2007 to distribute 5 kilograms of powder, and the other who conspired to distribute 5 kilograms of crack, both with two prior felony drug convictions. In 2007, before adoption of the Fair Sentencing Act, both would have been subject to mandatory life sentences—the powder defendant because the offense involved 5 kilograms or more, and the crack defendant because the offense involved 50 grams or more. The indictments would have tracked the statute, so the powder defendant's indictment would have charged 5 kilograms or more of powder, and the crack defendant's indictment would have charged 50 grams or more of crack. If both were convicted, both would have faced mandatory life sentences.

Under the offense-controls theory, nothing would change. Both defendants would still be subject to mandatory life sentences, just as two defendants who committed the same offenses today would be subject to mandatory life sentences.[7] There is no reason to believe Congress intended any different result.

But under the indictment-controls theory, the crack defendant would now face a minimum of only 10 years, not life, because he would be treated as having committed an offense involving only 50 grams of crack—not 280 or more as required to trigger the life sentence. This would be the result even though the offense actually involved 5 kilograms of crack and the government could prove it. The powder defendant, in contrast, would continue to serve the mandatory life sentence, because nothing in the Fair Sentencing Act or First Step Act allows a sentence reduction for a defendant whose offense involved only powder. Congress could not have intended to treat crack defendants this much more favorably than powder defendants.

---

[7] Actually, under § 401 of the First Step Act, the mandatory penalty in this hypothetical would be 25 years for offenders sentenced after December 21, 2018. But that provision does not apply retroactively to anyone sentenced earlier, and thus does not detract from the force of Judge Hinkle's explanation.

*Id.* at *6; *see also United States v. Russo*, 2019 WL 1277507, at *1 (D. Neb. Mar. 20, 2019) ("[T]he Court cannot conclude that the First Step Act anticipates a full re-sentencing with application of laws and Guidelines that have changed since a defendant's original sentencing, other than the retroactive application of the reduced penalties for crack cocaine set out in the Fair Sentencing Act. If the Court were to engage in such a re-sentencing, applying other laws and Guidelines that have been changed since Russo's original sentencing, it would work an injustice to offenders sentenced in the past who did not have a crack cocaine conviction qualifying for sentence reduction pursuant to the Fair Sentencing Act of 2010.").

Several other courts, including another from this district, thus far have agreed that eligibility is determined based on the actual quantity involved in the offense. *See United States v. McNabb*, No. 3:05cr96-RV (Doc. 70) (rejecting the "indictment-controls theory" of *Emerson Davis* and adopting the analysis of *Blocker*); *United States v. Haynes*, 2019 WL 1430125, at *2 (D. Neb. Mar. 29, 2019); *United States v. Potts*, 2019 WL 1059837, at *2 (S.D. Fla. Mar. 6, 2019); *cf. United States v. Glover*, 2019 WL 1924706, at *7 (S.D. Fla. May 1, 2019) (holding that *Apprendi* does not apply to a resentencing under Section 404).

A fair number of other courts (including this one) have disagreed, and determined eligibility based only on the pre-Fair Sentencing Act quantity

charged in the indictment. *See United States v. Allen*, 2019 WL 1877072, at *3 (D. Conn. Apr. 26, 2019); *United States v. Dodd*, 2019 WL 1529516, at *2-3 (S.D. Iowa Apr. 9, 2019); *United States v. Boulding,* 2019 WL 2135494 (W.D. Mich. May 16, 2019) (W.D. Mich. May 16, 2019) (Jonker, C.J.) (holding with no statutory analysis that anyone convicted under 841(b)(1)(A) or 841(b)(1)(B) is eligible for consideration); *United States v. Broussard*, 2019 U.S. Dist. LEXIS 72844, at *5-6 (D. Minn. Apr. 19, 2019); *United States v. Simons*, 2019 WL 1760840, *6 (E.D.N.Y. Apr. 22, 2019); *United States v. Martin*, 2019 WL 1558817, *3 (E.D.N.Y. Apr. 10, 2019); *United States v. Monae Davis*, 2019 WL 1054554, at *2 (W.D.N.Y. Mar. 6, 2019); *United States v. Pugh*, 2019 WL 1331684, at *3 (N.D. Ohio Mar. 25, 2019); *United States v. Pierre*, 2019 WL 1495123, at *5 (D.R.I. Apr. 5, 2019); *United States v. Stanback,* 2019 WL 1976445, at *3 (W.D. Va. May 2, 2019) (Urbanski, C.J.); *United States v. Laguerre*, 2019 WL 861417, at *3 (W.D. Va. Feb. 22, 2019) (Dillon, J.); *United States v. Glore*, 2019 WL 1060838, at *6 (E.D. Wis. Mar. 6, 2019); *see also United States v. Francis*, 2019 WL 1983254, *2 (S.D. Ala. May 3, 2019) (declining to look to original findings to determine statutory penalties, but relying on original findings to assess amended guideline range).

Most of these decisions, however, present little or no reasoning, and the few that do are unpersuasive. For instance, in a statement relied upon by many

courts, the district court in *Monae Davis* simply declared reliance on the "plain language" of the First Step Act, adding, "it is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act," without any assessment of the statutory analysis presented here. *Monae Davis*, 2019 WL 1054554 at *2-3. The *Boulder* court relied on *Monae Davis* to conclude all defendants sentenced for crack cocaine offenses before the First Step Act are "categorically eligible" for a reduction. 2019 WL 2135494 at *4. But neither *Monae Davis* nor *Boulder* nor any other decision cited above address in any respect the dispositive statutory language in both the First Step Act and in § 3582(c)(1)(B) discussed here.

In *Allen*, the court focused on "the purpose underlying the First Step Act," reasoning that

> Congress wanted to further the Fair Sentencing Act's objective of mitigating the effects of a sentencing scheme that had a racially disparate impact. *See Dorsey*, 567 U.S. at 268. Given this remedial purpose, the First Step Act should be construed to provide courts with discretion to reduce a sentence when the statute the defendant violated has been modified by the Fair Sentencing Act to provide less severe penalties.

2019 WL 1877072 at *3. But it in no way advances the remedial purposes of the Act to afford relief to a defendant that is greater than he would have received had his sentence been imposed after enactment of the Fair Sentencing Act. Rather, it is the government's position here that advocates and urges like

treatment of like offenders, consistent with the Congressional purpose, with relief afforded to those whose statutory sentencing ranges were in fact lowered by the Fair Sentencing Act, and denied to those whose ranges are unaffected.[8]

*Allen* also suggested that *Apprendi* and *Alleyne* should apply, stating, "Congress legislates in the context provided by constitutional principles." *Id.* at *4. Likewise, *Stanback* stated, "Congress, when drafting the First Step Act in 2018, surely did not intend for courts to disregard the last six years of Supreme Court federal sentencing jurisprudence and this court declines to do so." 2019 WL 1976445 at *3. But as explained above, it is the denial of relief here—like the denial of relief under *Booker* that the Supreme Court affirmed in *Dillon*—that is in fact consistent with recent law. It should not be concluded that Congress meant to afford such retroactive relief to a limited set of crack offenders that is not extended to anyone else.

In *Pierre*, the district court took another track, stating:

> The Government's approach, while reasonable, is problematic in several ways. First, it effectively requires the Court to employ a prosecutor-friendly "way-back machine" to conjure how the charge, plea, and sentencing would have looked had the Fair Sentencing Act of 2010 been in effect. For example, here, the Court is not confident that a well-counseled defendant caught with 28.77 grams of crack cocaine and a reasonable prosecutor from this District

---

[8] To date, courts have reduced the sentences of over 1,100 offenders under § 404, almost all with the consent of the government, given that many pre-2010 offenders were serving sentences based on actual crack quantities that are subject to lower penalties under the 2010 law.

> would have reached a plea deal of 28 grams or more of crack
> cocaine, thereby triggering the mandatory minimum by a mere .77
> grams of crack cocaine. Indeed, it seems likely in this Court's
> experience the parties would have agreed to a plea to a lower
> quantity.

*Pierre*, 2019 WL 1495123, at *5. In a similar vein, Defendant asserts here that

the government's approach "creates a number of practical difficulties,"

including "the need to interpret plea colloquies and documents, to sort relevant

conduct from offense conduct … and to hold hearings to address" unresolved

sentencing issues.

> Judge Hinkle effectively rebutted these views in *Blocker*:
>
> Had the indictment charged the higher amount of crack—280
> grams—on count one, it might or might not have affected Mr.
> Blocker's decision to plead guilty. The government would have
> relied on the same drug-amount evidence it relied on at that time
> and that it now relies on in response to the motion to reduce the
> sentence. Mr. Blocker might or might not have admitted that the
> conspiracy involved at least 280 grams of crack. Had he denied it,
> the government might or might not have been able to prove it
> beyond a reasonable doubt.
>
> It may not be possible now, after the fact, to resolve with certainty
> the question about what would have happened. But courts routinely
> resolve issues on which certainty is elusive, including issues like this
> one. Thus, for example, courts routinely must decide what would
> have happened when addressing ineffective-assistance-of-counsel
> claims on motions under 28 U.S.C. § 2255 or on petitions for writs
> of habeas corpus under 28 U.S.C. § 2254.

*Blocker*, 2019 WL 2051957 at *4. In the present case, however, there is no

uncertainty—neither now nor when he was sentenced in 1990 did Defendant

dispute that his offense involved at least 10 kilograms of crack. *See* Doc. 842 at 1 (listing Defendant's objections to the presentence report and this Court's rulings, which did not include an objection to the drug amount).

Finally, courts have cited the rule of lenity. *See Allen*, 2019 WL 1877072 at *3; *Pierre*, 2019 WL 1495123 at *5. But "[a]pplication of the rule of lenity requires more than a difficult interpretative question. Rather, '[t]o invoke the rule, we must conclude that there is a grievous ambiguity or uncertainty in the statute.'" *United States v. Flemming*, 617 F.3d 252, 270 (3d Cir. 2010), citing *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (internal quotation marks and citation omitted). The rule of lenity is reserved "for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990). For all the reasons stated earlier, there is no such grievous ambiguity in the First Step Act. To the contrary, all tools of statutory interpretation point to the conclusion that an offender whose crack quantity supports the same penalty range under the Fair Sentencing Act that was applied at the original sentencing proceeding is not eligible for relief.

For all these reasons, the government contends Defendant is not eligible for a sentence reduction under the First Step Act. During Defendant's 1990

sentencing, this Court determined—based upon the trial record and the presentence report—that Defendant's violations involved at least 10 kilograms of crack cocaine. Defendant does not dispute that his violation involved at least 10 kilograms of crack cocaine. The penalties for a violation of § 841(a) involving at least 10 kilograms of crack cocaine were not changed by the Fair Sentencing Act. Thus, Defendant's violation of § 841(a) is not a "covered offense" for purposes of the First Step Act, and he is ineligible for a reduction. *See* First Step Act § 404(a), (b). Accordingly, Defendant's motion, Doc. 844, must be denied.

IV.   Even if Defendant is Eligible for a Reduction, this Court
Should Decline to Reduce Defendant's Life Sentence

Even if this Court disagrees with the government's legal assessment of eligibility, it should deny relief in the exercise of its discretion. Given the known and undisputed quantity involved in the offense, Defendant would have received the same sentence if the Fair Sentencing Act had been in effect at the time of the original sentencing and the government had presented its case subject to the Fair Sentencing Act's requirements. Defendant should not receive a windfall not available to defendants prosecuted for the same conduct under the Fair Sentencing Act who received sentences based on quantity determinations keyed to the thresholds set forth in that Act. A contrary result here would offend "the need to avoid unwarranted sentencing disparities among" similarly situated offenders under 18 U.S.C. § 3553(a)(6), and the need for a sentence to "reflect

the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense" under § 3553(a)(2)(A). *See Dorsey*, 567 U.S. at 276-79 (expressing the importance of consistency in sentencing similarly situated offenders when determining the retroactive application of a statutory amendment).

Moreover, even without the mandatory minimum, the Sentencing Guidelines still call for a life sentence. *See* U.S. Probation Memorandum. Thus, any sentence below the life sentence imposed would constitute a downward variance requiring proportional justification. *See United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc). Defendant seeks a sentence of time served, which he estimates to be a sentence of approximately 30 years. Doc. 844 at 16-17. Such a substantial downward variance requires substantial justification. *Irey*, 612 F.3d at 1196 (holding that a "major variance" requires justification that is "sufficiently compelling to support the degree of the variance.").

The aggravators in this case are many and justify the sentence imposed. Defendant led a conspiracy that poisoned his community with approximately 100 kilograms of crack cocaine. PSR ¶ 4. He employed violence, beat his girlfriend, and carried firearms "routinely." PSR ¶¶ 8-9. He boasted his involvement in not one but two murders and, according to his girlfriend, "put a

pistol to the head of dealer" who did not pay him. PSR ¶ 9. When his drug-dealing activities inevitably lead to his arrest, rather than accept responsibility for his actions, Defendant employed a calculated strategy of obstruction, which typically involved giving a false name to stymie any efforts to prosecute him. PSR ¶ 10. And when finally arrested in this case, after having fled to all the way to Wichita, Kansas, Defendant had a firearm and taunted that the officers "should be careful because he always kept a round in the chamber." PSR ¶ 8.

To be sure, the aggravating circumstances described above date over 30 years ago. And while the government agrees that this Court may consider a defendant's post-sentencing conduct when deciding whether to grant a sentence reduction, *Pepper v. United States*, 562 U.S. 476 (2011), the factors identified by Defendant do not justify the substantial variance he seeks.

The argument that Defendant is now older, wiser, and less violent would be more compelling if his prison disciplinary record corroborated it. It does not. Rather, at least until 2012, Defendant continued to violate the rules, as evidenced by the 11 disciplinary actions in his prison record.[9] Three of these incidents—occurring in 1993, 1994, and 2006—involved violence, and the latest of the three involved a dangerous weapon (a shank). That Defendant has been incarcerated since 1990 but has been discipline free since only September of 2012

---

[9] The most recent three actions all occurred on the same day in 2012.

does not justify a downward variance.[10] Defendant also points to the "additional penalty" of deportation as a factor justifying a lower sentence. But imposing a lesser sentence due to collateral consequences of immigration status "would be to favor aliens with more lenient sentences than citizens of this country who commit the same crime and have the same criminal history." *United States v. Maung*, 320 F.3d 1305, 1309 (11th Cir. 2003).

In sum, the record, even accounting for Defendant's post-sentencing conduct, does not justify a downward variance in this case.  Thus, even if the Court concludes it has the authority to reduce Defendant's sentence, it should decline to do so.

---

[10] Defendant's motion also includes a letter from his most recent prison counselor. Doc. 844-1. While the government fully agrees that letter's description of Defendant's progress is encouraging, the counselor who authored the letter has been Defendant's counselor for just short of three years, which is less than 10% of the time Defendant has served.

V. <u>Conclusion</u>

For the forgoing reasons, the government submits that Defendant is ineligible for a sentence reduction under the First Step Act, and his motion must be denied. Should this Court disagree and conclude Defendant is eligible for relief, the government asks this Court, in its discretion, to decline to reduce Defendant's life sentence.

Respectfully submitted,

LAWRENCE KEEFE
United States Attorney

JORDANE E. LEARN
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 117808
111 North Adams Street, 4th Floor
Tallahassee, FL 32301
(850) 942-8430
jordane.e.learn@usdoj.gov

CERTIFICATE OF COMPLIANCE

I certify that this response complies with Local Rule 7.1(F) U.S. District Court for the Northern District of Florida. This notice contains <u>7,304</u> words.

<u>s/ Jordane E. Learn</u>
JORDANE E. LEARN
Assistant United States Attorney

CERTIFICATE OF SERVICE

I certify that one copy of the foregoing has been served electronically via CM/ECF to Randolph Murrell, Federal Public Defender, counsel to Defendant Stanton Robinson, this 31st day of May 2019.

<u>s/ Jordane E. Learn</u>
JORDANE E. LEARN
Assistant United States Attorney
